UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION


UNITED STATES OF AMERICA          )
                                  )
VS                                )    No. 2:19-cr-03-1
                                  )
HEATHER L. MARKS                  )
_____


BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

October 8, 2025

_____


_____

Roxann Harkins, RPR, CRR
Official Court Reporter
719 Church Street, Ste 2300
Nashville, TN 37203
615.403.8314
roxann_harkins@tnmd.uscourts.gov

**APPEARANCES:**

For the Government:    JAMES HAYES
LAUREN R. RANDELL
Department of Justice
1400 New York Avenue
Washington, DC 20005


For the Defendant :    MEGGAN B. SULLIVAN
Chapman Law Group
424 Church Street
Suite 2000
Nashville, TN 37201


JENNIFER L. THOMPSON
3200 West End Avenue
Suite 500
Nashville, TN 37203

The above-styled cause came to be heard on October 8, 2025, before the Hon. Aleta A. Trauger, District Judge, when the following proceedings were had at 1:44 p.m., to-wit:

THE COURT: So we're here on the pretrial conference in United States versus Heather Marks. And we have for the government James Hayes and Lauren Randell. Sorry, I couldn't remember your name.

MS. RANDELL: Hello, Your Honor.

THE COURT: From Justice.

And we have for Ms. Marks, we have Meggan Sullivan and Jennifer Thompson. This is Ms. Marks and this is your father. Hello. Welcome.

FATHER: Hello.

THE COURT: If you can't hear what we're saying, you can move up a little bit.

FATHER: I'm fine.

THE COURT: Very good. First of all, I think we probably do need to continue the trial, given the financial burdens on the defense team, but I'm going to rule on everything today and it's going to be frozen and you are not filing any more motions. All right? Everybody understand that?

And you might not have trial -- I'm surprised you had travel funds to come today. You may not have travel funds by October 21 either. So I understand that the initial motion to continue you-all did not oppose. Am I right?

MR. HAYES: You are correct.

THE COURT: Okay. And then a supplement was filed with even more detail about the financial hardship on the defense team, not just the lawyers, but everybody else.

So -- and I think what we're going to do in terms of rescheduling is we're going to wait until this hiatus is over, the budget problem is over and we have some sense of the flow of money, and then we will convene a telephone conference and figure out when it makes sense to reset the trial.

MR. HAYES: Can I make a suggestion, Your Honor?

THE COURT: Sure.

MR. HAYES: We don't know when that's going to be, so we might want to put on the record -- I'm sure Ms. Sullivan has -- she has personal things coming up and then we have some trials coming -- and that's not to say we'll be held to that, but we may want to put on the record that there's, over the next

five months, certain times that might not work.  Of course, that can change if the Court is so inclined.  Or if you want to say there's no need to talk about all that now, but we can just say what our upcoming schedules are just in case.

THE COURT:  Well, why don't you do that right before we have the phone conference, because I'm not going to be figuring out when we can do this until it's time to figure out when we can do it.  And by that time some of your other things might have changed.

MR. HAYES:  Possibly, sure.

THE COURT:  So let's have you do that before a phone conference to reset the trial.

Okay.  The motion for the bill of particulars has not been responded to.  It seems to me it's rather similar to a motion I granted on the 17th of September about directing the government to give notice of its intention to rely upon other crimes evidence, and that one you talked about 404(b), but you also talked about co-conspirators.

I am going to ask the government to give us a little bit of information about its theory in terms of who the co-conspirators are now that Dr. Mehta is out of it.  And it certainly seems as

though, from the information he has pled to and the version of facts that he admitted to on his plea, that he, at least so far, has not admitted to being in a conspiracy with Ms. Marks at all.

And so let me just ask you, do you think he will be testifying to facts that put him in a conspiracy?

MR. HAYES: We do, Your Honor, but as you said, he hasn't admitted being in a conspiracy, so it would be a theory of willful blindness. What he's saying is I was not told certain things so I didn't know certain things, so -- but the theory would be, well, he should have, but he did not plead to that. So we're not saying that he has admitted to the crime, but we think he would be under that theory --

THE COURT: So he will be admitting facts that put him in the conspiracy, but if he went to trial, it would be subject to his defense of willful blindness.

MR. HAYES: Yes. So I guess -- looking from a thousand-foot view, Your Honor, he's saying I didn't review 100 percent of the files. Well, he should have and he was supposed to and he was required to, but he didn't. So that would be -- I'm oversimplifying it, but that's the basic theory of

willful blindness that if you're not doing that, you are essentially acting as -- in a way that aids and abets the charged conspiracy at the very least, but we would say under a theory of willful blindness, he could have -- the government chose not to, could have still been proceeded against -- if he had gone to trial, I'm sure that would have been his defense as Your Honor just noticed.

THE COURT: Okay. And Kathryn -- is it Dupray? What is her name?

MS. RANDELL: DuBray.

THE COURT: She's another conspirator.

MR. HAYES: She is, Your Honor. As is Gia Ruggiero.

THE COURT: Who?

MS. RANDELL: G-i-a, R-u-g-g-i-e-r-o. Who is the owner of the clinic.

THE COURT: Anybody else?

MR. HAYES: I think under a similar theory of willful blindness, I don't know that we have to get into this because we just named three, you could say some of the other nurse practitioners to varying degrees.

THE COURT: All right. And do you intend to give them a bill of particulars answering their

specific questions?

MS. RANDELL: Your Honor, we would object, and we had planned on responding and objecting to the proposed bill. We think even as to co-conspirators that the Sixth Circuit in *Vassar* said that that's not generally appropriate, but overall under *Salisbury* and others where there is so much discovery that's been produced including all interview reports have been produced many months ago, years in many cases, that precedent says that a bill of particulars is just not necessary in that situation. All the information is there.

Even beyond that, as the Court has been informed previously, there was a substantial reverse proffer provided by the government to Ms. Marks's counsel in which the theory of case, specific messages, specific individuals, all those were proffered. And where all that information has already been provided, the government doesn't think there's a basis to order a bill of particulars, especially as here it doesn't ask for a theory of the case at all. It's purely a list of facts, who, what, when, where, which consistently has been rejected as far as the bill of particulars, especially when substantial discovery has been provided.

THE COURT: Okay. Well, I'll await your response, which is due, I think, the 13th. And I'll do a written ruling on that.

MR. HAYES: I guess the 14th, Your Honor, since the 13th is a --

THE COURT: It's a holiday, that's right.

Have you-all done these disclosures on the expert that you -- you gave me a timeline for that.

MR. HAYES: We have, Your Honor. Now, the defense hasn't been able to, given the financial situation.

THE COURT: I see.

MR. HAYES: We don't dispute that, but we weren't under the same constraints, so we gave our disclosure of our one expert, written, and we responded to the one disclosure we already had for Mr. Staples, much of which the Court had actually excluded in a prior order, so we provided that by the deadline.

THE COURT: Okay.

MR. HAYES: And, you know, the defense is under different constraints than we are, so we don't blame them.

THE COURT: Okay.

MR. HAYES: So they haven't been able --

THE COURT: You-all work that out when we get a new trial date. Y'all figure out when that should take place.

Okay. Now I'm going to rule on these various motions in limine that I haven't already ruled on in a written order. And there are several of those, I don't know, five or six of them that have written orders.

All right. The government's Omnibus Motion No. 314. And I am going to be revisiting some earlier rulings that I made, and the defense will not be happy to know I'm reversing several of them based upon *Ruan* and other things.

Since the rulings I made at the pretrial conference in 2021 where we had totally different counsel on both sides and we had different case law governing the situation, we've had the *Ruan* decision which came down in 2022. And now the defense -- the government must prove that the defendant knew that she was acting in an unauthorized manner or intended to do so. She knew her acts were without legitimate medical purpose in the usual course of professional practice.

And the Sixth Circuit has approved the use of circumstantial evidence in order to prove the

defendant's intent.

So with regard to -- I believe you referred to this as No. 15, Motion in Limine No. 15, this is the message and pill bottle from the drug bust of July 26 of 2017. The prior motion of the defense was denied as moot because the government said it wasn't offering it. This is in the middle of the conspiracy. The defendant's only concern was looking bad, supposedly did not tell Mehta about it.

So this has messages, as well as the pill bottle with the pills that show that this is some -- a prescription that she wrote. And this I'm going to admit for notice and knowledge of Ms. Marks that her pills that she was prescribing were being diverted.

The probative value outweighs the prejudice, and it is not 404(b). It is -- it is evidence of her knowledge, which the government must prove. So this is going to be admitted.

No. 16, this is a text message, "our patients would be dumb enough to do this." This is a statement she makes to an unindicted co-conspirator, Kathryn DuBray. I'm going to remain with my original ruling and not admit this document. I find with this one that the prejudice outweighs its probative value. It doesn't have much probative value as far as I'm

concerned.  It just kind of dirties up Ms. Marks for her to be making a statement like that.

The statement, however, which is apparently also part of No. 16, "hope we some day have 400 good patients or at least good at not getting caught," this is an admission by Ms. Marks that she knows that her patients were at that point doing something wrong, like selling their pills.  And that is important evidence of her knowledge and notice to her of what they were doing.  I find that the probative value far outweighs the prejudice on that one.  And it is an admission by her.  It doesn't need to qualify as a co-conspirator statement.  So that one will come in.

No. 17, this is a September 28 of '17 warning letter of concern to the defendant from the Tennessee Department of Health.  This is going to be admitted with the limiting instruction that it is not offered for the truth.  However -- let me back up a minute.  This is notice to her that her practices were outside the usual course.  The fact that some of these records were when she was at PainMed is not really pertinent because the letter relates to her practices wherever she was.  And if these are things happening in the midst of the conspiracy, then they will come in

any way.

The government -- you maintain that you are going to have proof that she continued these practices after receiving this letter?

MR. HAYES:  Correct, Your Honor.

THE COURT:  And so under this *Suetholz* case, S-u-e-t-h-o-l-z, this is admissible as going to her knowledge and intent.  My ruling on this back in June of 2021 was different.  My ruling said it might be relevant to knowledge and intent.  But since then we have had the *Ruan* case, which means that the government must have more proof of knowledge and intent than it did in 2021.  So there's a stricter requirement on intent.

Also, conceded -- admittedly, the government is making better arguments in this motion than were made in 2021, and also the *Suetholz* case has come down since then where not only was this kind of proof admitted about an investigation by a government body, but the sanctions by the State medical board were admitted as notice to the defendant.  And it was under stricter 404(b) standard.  So I find that this should come in.

And an additional reason -- and I don't believe the government argued this, but it seems to me

to the extent there's any hearsay objection, this would come in under the residual exception of Rule 807 that statement is supported by sufficient guarantees of trustworthiness after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement and it's more probative on the point for which it's offered than other evidence. This is very probative of notice, knowledge, intent.

And the same thing goes for the July 26, '17, letter to Marks from TennCare. Again -- and the April 18 letter to Marks, the top prescriber letter. These were all in the middle of the conspiracy. They were notice to her of her outlier status. This one on dosage, as well as the number of prescriptions.

My ruling in 2021 was based only on the number of prescriptions. I don't believe the defense argued against the -- about the dosage. Certainly the number of prescriptions, you can certainly on cross-examination point out this is a pain clinic, we're obviously going to have more prescriptions.

But in terms of the dosage, that is very pertinent evidence of the prescribing practices being outside the usual course of professional practice. The letter -- I forget which one of these -- says that

the average prescription is 45.87 MEDD, and Ms. Marks' were 141 MEDD. That's -- that is quite a difference.

And also, I ruled on this in writing in the *Wier* case, which I know you-all are familiar with, and I'll refer you -- that Case No. is 2:21-cr-008, Docket No. 365. And that decision talks about the outlier letters and statistical evidence of volume and peer comparisons related to the dispensing of controlled substances is admissible under Sixth Circuit case law; probative value, important on knowledge and intent.

And, again, these, to the extent there's a hearsay exception, I believe they would come in again -- I mean, these statistics are taken from government statistics that everybody has access to. The defendant has access to them. The pharmacies have access to them, and they are certainly -- certainly they have guarantees of trustworthiness.

And then the last one in this motion is No. 19, these are redacted text messages between Ms. Marks and DuBray. They're mostly about a trip -- this is where Ms. Marks tells a Patient Whitaker, who is Count Nine in the superseding indictment, that he could have a second chance after he is discharged for methamphetamine.

I'm not going to let this in. The text message is seven months after he was discharged. And the government says it shows that she remembers he was discharged for meth but was still willing to prescribe for him without knowing anything about a treatment plan or his pain, et cetera.

I presume the government is asserting that because the records show that, but she may have asked those questions before she prescribed again. We don't know whether she did or not and they're not reflected in the records. The fact that she prescribed for him after a positive for meth is going to come in any way; right? This is a count of the indictment. And so the positive meth test will be in there. And it will be in the record.

So you can certainly argue she knew about it because it's in the medical record. And I think that this text message would be cumulative. It might be appropriate rebuttal evidence if she denies that she knew about the meth -- the positive meth test, but I'm going to rule as an initial matter that it will not come into evidence.

MS. RANDELL: Your Honor, before we move on past the government's motions, regarding No. 16 and the additional text messages related to "good patients

or at least good at not getting caught," for clarity, that's actually part of Government's Exhibit 702, which is a separate exhibit which the defendant has also challenged as part of one of her motions.

THE COURT: Is that part of the motion to exclude drug utilization records --

MS. RANDELL: No.

THE COURT: -- and Do Not Fill records?

MS. RANDELL: It's part of the 26 exhibits that were challenged at the end of the motion challenging references to nonindictment patients.

THE COURT: Oh.

MS. RANDELL: There were 26 government exhibits challenged, one of which is Government's Exhibit 702, which includes that message. So it's not part of the same shorter message chain at issue related to the "our patients would be dumb enough to do this." It's a different exhibit.

THE COURT: Okay. Is it attached -- is 702 attached to your motion?

MS. RANDELL: It was not. It's attached to the defendant's motion.

THE COURT: Okay.

MS. SULLIVAN: I can pull up 702, Your Honor.

THE COURT: What is the number of the defense motion you're referring to?

MS. RANDELL: I believe that's motion --

THE COURT: Docket number.

MS. RANDELL: Docket No. 292.

THE COURT: Okay, I'm going to get to that.

MS. RANDELL: So the Court understands, that one message that the Court ruled will be admitted as part of 702.

THE COURT: All right.

MS. RANDELL: Thank you.

MR. HAYES: So it's just a smaller part of a much larger text string is all we're saying, Your Honor.

THE COURT: Okay.

All right. Then the defense motion to exclude drug utilization records and all Do Not Fill or Refusal to Fill letters from pharmacies. All right. First of all, this is Docket 313, and as far as the Walmart letter, the government says they're not going to use the Walmart letter. Your motion doesn't really contain any law supporting your position. This evidence is not 404(b) evidence. It is evidence of the very scheme that is charged. And under the

*Winestock* decision, this is intrinsic evidence.

The drug utilization review records from United Healthcare and CVS is circumstantial evidence of knowledge. The proof is apparently going to show that she continued to do these same things in the face of these notices. And the *Stanton* decision is likewise supportive of the admission of these documents.

Again, I think they would -- to the extent there's a hearsay objection, they would come in under the catch-all of 807 as being -- having hallmarks of authenticity. And specifically the CSMD records have been certified. You've got them certified; right? All of those?

MS. RANDELL: Yes, Your Honor.

THE COURT: So they contain a certified -- certification under Rule 902. So basically this motion is denied and all that.

Is the proof going to show Ms. Marks responding -- you've got some responses of her, by Ms. Marks to some of these where she basically says, we're a pain -- this person is in pain management. And is the proof going to show that that's basically how she responded to all of these?

MR. HAYES: I think -- I don't think we

can say -- can we tie every single time she was notified she responded the exact same way, but, yes, largely --

THE COURT: Several times.

MR. HAYES: Yes.

THE COURT: Okay. And also, I noticed on some of them that there are records, for instance, that someone who was not doing pain management, someone who was just a GP -- I'm trying to find one -- where a physician that I know was just a GP was prescribing a lot of different drugs that I do not believe were pain pills. I'm trying to find that one.

It's one where Jennifer Bess prescribed a number of prescriptions. Here it is. I'll just disclose, Jennifer Bess is my physician and I know she doesn't run a pain management clinic, okay.

So this is -- I'm looking at Docket 385-2, page 4. This is a patient Leann Gallardo where Dr. Bess is prescribing all kinds of things that at least I don't recognize them as opiates. They may be.

And then there are Mehta prescriptions for buprenorphine. And I guess my question is: Is the government going to have an expert that is going to say, you don't prescribe pain medicines when

someone's on these other medicines? I mean, this person must have had a whole lot of health conditions. And is your expert going to opine about that?

MR. HAYES: Buprenorphine, certainly, Your Honor. I think that's already in our disclosure.

THE COURT: When they're on a bunch of other --

MR. HAYES: Right. And that will almost certainly come up in cross even if it's not in the written direct, although it is in the written direct to some extent, but that will inevitably come up in the cross and redirect is that there are certain things you have to watch out for, it's not just meth. It could be stuff that's prescribed like buprenorphine because those can -- I'm not saying always, but that can be very dangerous in combination.

MS. SULLIVAN: Buprenorphine with opioids, but not buprenorphine with Dr. Bess's --

MR. HAYES: That's not what Your Honor was asking. If they're taking --

THE COURT: No, I don't think that Jennifer Bess is prescribing buprenorphine. Mehta is prescribing that on top -- and my question was: Is your expert going to say you don't prescribe buprenorphine -- I never can pronounce that right --

when the person is on all these other drugs?

MR. HAYES: If included in all these other drugs includes opioids, then yes. I'm not looking specifically at all these other drugs that I think this other doctor is talking about.

THE COURT: I'm talking about the other drugs that Jennifer Bess is prescribing which are not opioids, I don't think. You know them better than I do. Are those opioids that she's prescribing?

MS. SULLIVAN: No.

MR. HAYES: If gabapentin is in there, I don't know that it is --

MS. SULLIVAN: Some anti-anxiety medicines are also, in combination, but those don't look like any antianxiety medicines either. One of them is calcium. So I don't think they would be any of the typical -- it used to be three medicines, those three in combination. Then it changed.

THE COURT: Which three in combination?

MS. SULLIVAN: It was an opioid with an anti-anxiety and a muscle relaxer, but now it's changed to just two of those. So it could be like an opioid and anti-anxiety or an opioid and a muscle relaxer.

THE COURT: And you're saying those are

not supposed to be given at the same time or they --

MS. SULLIVAN: Depends what school of thought you're --

MR. HAYES: I think we would say that, Your Honor.

THE COURT: That's what you would say, okay.

MS. SULLIVAN: But those medicines from Dr. Bess -- I'm assuming doctor, could be a nurse practitioner. From Bess, I don't believe those are in any of those camps with an opioid.

THE COURT: Okay. At any rate, so that's my ruling on that one. Basically that motion is denied.

Defendant's motion 292. And this is the one that you were talking about. And I don't intend to rule on 90 pages of text messages specifically, but these are my thoughts about that one:

The -- first of all, you are -- the government is saying it is not going to introduce any evidence of overdoses or deaths of Marks's patients. Correct?

MR. HAYES: Correct, Your Honor.

THE COURT: You will be having experts talk about the risk of that. In fact, were there

overdoses or deaths as a result -- I mean, of her patients?

MS. RANDELL: Not among the patients specifically referenced in the indictment as far as their charged prescriptions, nor of the additional patient whose records our expert examined and has included in his disclosure. I think broader is -- I don't know that I'm able to say either way, Your Honor, partly because we are not intending to make that argument.

THE COURT: All right. With regard to the nonindicted patients, this is -- okay. The nonindicted patients' information is relevant. It is -- the overall prescribing practices of Ms. Marks are relevant. And this additional -- these nonindicted patients, they're offered for notice that she is deviating from the usual course of professional practice as a matter of course. It's direct evidence of the conspiracy. It's not 404(b) material. So evidence of nonindicted patients will be coming in.

You make some reference here to pill mill, and I'm going to talk about that in a minute.

And, again, I'm going to refer you, if I can find it, to a decision I wrote on this very same issue in the *Wier* case. And it's Docket No. 365 where

I ruled that the general practices and policies of the practice are relevant in a conspiracy case.  And I cited to the *Seelig* case, S-e-e-l-i-g, evidence of high volume can be used to show intent and willfulness.

And then another decision in *Wier*, which is Docket No. 372 that evidence of nonindicted patients is not a variance and it's not 404(b).  It is inextricably intertwined with the charged events.  It's direct evidence of the conspiracy and a continuing pattern of illegal activity, and the probative value outweighs potential prejudice.  The facts are very similar, and I've got all the case law in those decisions, which I refer you to.  So that motion basically is denied.

The defense motion to reconsider my ruling on Mehta's Motion in Limine 9 and 10 and motion to admit evidence previously excluded.  This is --

MS. SULLIVAN:  Judge, we can withdraw that motion.  Ms. Hodde, since then, has provided me with information I wasn't privy to before.

THE COURT:  Oh.

MS. SULLIVAN:  Let me just make sure that that's the right one.

THE COURT:  It's 309.  It's about the

extramarital affair. It's about hiding THC and all that.

MS. SULLIVAN: Yeah. The marital affair and -- I'm trying to remember --

THE COURT: The other one was an attempt to hide THC in his urine --

MS. SULLIVAN: That one, not withdrawing on that one.

THE COURT: Yeah. And I'm ruling in favor of you on that one.

MS. SULLIVAN: That's a good thing I said that, then.

THE COURT: That will come in. The attempt to hide his THC in urine under 608(b)(1), it's a specific instance of conduct that goes to his character for truthfulness. And I'm just going to instruct you to ask a leading question on that. Isn't it true that you did this. And I presume he will -- I presume he will admit it.

If he does not admit it, then I have to decide if I'm going to let you put in extrinsic evidence. And I will determine at that point of the trial whether I think it's very important. And if I think it's very important, I will allow you to introduce extrinsic evidence, but that's not a call

I'm going to make in advance.

MR. HAYES: What I think will happen, Your Honor -- and there's some things to discuss here, just so the record is clear -- what you're saying is the extramarital affair --

THE COURT: Is out.

MR. HAYES: -- that's withdrawn anyway.

THE COURT: And I was going to keep that out anyway, yeah.

MR. HAYES: This is coming in, we understand. We can ask the leading questions the Court instructs. We think -- I think what Dr. Mehta would say if he testified on this was he sought this how to do something about the THC, so he asked questions.

THE COURT: Yes.

MR. HAYES: I think what he also might say is maybe he didn't actually use either of the methods. There's fake urine and charcoal or what's being discussed in the text message.

THE COURT: Right.

MR. HAYES: He didn't actually do either. So I think he would -- so that might be -- what I might also say, that there's stuff about -- there's a text string about this. And if he's just going to

admit it, I don't know that under -- I think it's under the extrinsic evidence for something he's admitted to wouldn't necessarily be admissible because there's some stuff in those text strings that are a little inflammatory. So we might either redact portions of the text string, and I can explain why. There's a picture that's a little out there.

THE COURT: Okay. I don't know why the texts would have to come in if he admits it.

MR. HAYES: That's what I mean.

THE COURT: Yeah.

MR. HAYES: I don't think they would, and I don't know that the defense necessarily even has a problem with that. I think he would admit I sought information from this person.

THE COURT: Yeah.

MR. HAYES: He might have to get into the why he sought information from this particular person because he figured she would know about it for various reasons. I suppose if he's asked, we'll get him to admit it in a leading question, but when he's crossed that will probably come up. We can deal with that as it happens and explain further and going through it with defense. I think we're having a heated agreement that he's going to admit it and there's no need for

the text messages at least at this point.

THE COURT: Yeah. I mean, that would be extrinsic evidence of -- this proof about his character for truthfulness. As I said, I would make that ruling at the time.

Okay. Let's see. Motion to exclude the phrase "cash only." This is granted to the extent that agents may not describe this practice as cash only, but it is denied to the extent that the defendant used those words. If she used those words, they're admissions and they will come in. And certainly, you know, someone will explain that cash only also includes credit cards. But her words can be used.

MR. HAYES: There's a third category, Your Honor. Patients -- and this is in some 302s, I believe, but they'll say it was -- and they say, well, it was cash only. What they mean is they don't mean actual cash, they mean credit cards or money orders or whatever. But they are frequently, when we talk to them, saying, well, it was cash only.

THE COURT: Yeah.

MR. HAYES: So it may be that patients will want to refer to it that way.

THE COURT: Well, if they say it, they

say it, you can clear it up on cross that -- you could have given a credit card, couldn't you? It's just that they didn't bill insurance.

MS. SULLIVAN: Right.

THE COURT: I mean, that's what it means. They didn't bill insurance.

MS. SULLIVAN: Right. You already know the reason.

MR. HAYES: We could ask leading questions.

THE COURT: Excuse me?

MR. HAYES: We can ask leading questions.

THE COURT: Yeah, of those witnesses to keep them from saying it, and you can caution them ahead of time, please don't use that. But, you know, if it comes out, it comes out. And it's explainable.

MR. HAYES: Well, the leading question -- for whatever reason, these patients all say it, and I think they're almost getting it -- and we'll delve into this a little further, where is this phrase coming from because I think --

THE COURT: Would they say it came from her?

MR. HAYES: From her, at least someone in the clinic.

THE COURT: Or the practice.

MR. HAYES: Or the practice, their understanding. What we could do, the leading question could ask, but cash only, you don't mean actual cash, you mean credit cards, right? And they'll say yeah. They just wouldn't take insurance.

THE COURT: Yeah. You can clear that up.

MS. SULLIVAN: The concern is that it's somehow a factor of being this -- the theory that we're dancing around that it was a pill mill so that's a characteristic of a pill mill is that it's cash only.

THE COURT: That's what you know, but the jury doesn't know that.

MS. SULLIVAN: Right, and then them drawing inferences from that. So I don't have -- I can on cross clear up the credit card, cash. I'm not too worried about dancing around that as much as I am somehow it coming from agents and it being something that I've already been excluded from talking about it.

THE COURT: Yeah.

Then the last one I have is exclude all reference or evidence to patient overdose, injury or death. You may think that the government is going to do that, but I'm going to grant this. The government

says they're not going to introduce anything, but I'm going to grant it. If somehow something becomes relevant, then you'll approach the bench. But Marks -- you-all will not be able to argue that you're not going to hear any evidence of death or overdose. You're not going to be allowed to argue that.

So those are my rulings.

MS. SULLIVAN: There are -- there is some testimony -- or not testimony, potential testimony contained in some of the interview reports where the patients say I overdosed. And it's not clear whether it was medications from Ms. Marks, medications from Mehta, medications from one of the other subsequent physicians. And they say because I overdosed I stopped --

THE COURT: I'm ruling -- oh, okay.

MS. SULLIVAN: -- pain medication altogether.

THE COURT: Okay. Is it going to be in the medical records that they told people at the clinic that they overdosed?

MS. SULLIVAN: I believe -- I can't remember -- I think there was one nonindictment patient, and it was subsequent to -- even potentially years after Heather stopped working there and she

stopped being this particular -- I don't remember, might have been Carter Brockman, I can't remember, that he overdosed and it was that overdose that led him to --

MS. THOMPSON: Sobriety.

MS. SULLIVAN: -- sobriety altogether.

THE COURT: Well, I'm sure the government's not going to ask him about it.

MR. HAYES: He's not a count patient -- I'm sorry, actually, that one patient is. I think what I meant to say was what Ms. Sullivan was talking about is largely -- doesn't really pertain much to the count patients' medical records. There's this one instance that this happened, as she says, after the fact.

We can -- we will not ask him about that. We can instruct him on that. I think it may come up on cross-examination, I mean, we're talking about some people at least that had addiction problems. So if they're being asked anything, at least to have you ever had a drug problem or overdose, you know, even if we don't get into it with them in prep, they may say yes. So it's just something that could come up with this patient population, but it's not anything that's directly in the medical records that I'm aware of

other than what Ms. Sullivan just referenced.

THE COURT: And I don't know that --
well, I mean, you could certainly clear it up on cross
because you'll have the records.

MS. SULLIVAN: But these are patients
that I don't have the records for. They're patients
that have -- and definitely not records where Heather
was seeing them and there's no causation, there's
no -- there's no connection to Heather at all
potentially. But I think you said there's only going
to be one patient.

MR. HAYES: Of the count patients there's
only one where I'm aware this is an issue.

MS. RANDELL: I think to the extent what
counsel is discussing is that it sounds like it was
years after that patient saw Ms. Marks. So there
would certainly be no confusion or kind of
suggestion --

THE COURT: Yeah.

MS. RANDELL: -- that Ms. Marks was in
any way responsible for something that happened years
later.

THE COURT: You-all could clear it up on
direct.

MS. RANDELL: Right.

THE COURT: And if not, you can clear it up. I don't see that it's a problem.

Okay. And the other things I've ruled on. Does anybody think I've not ruled on something that you're --

MR. HAYES: Wasn't there a motion about --

THE COURT: -- waiting on with bated breath?

MR. HAYES: Was there a motion about using the term pill mill?

THE COURT: I think there was somewhere. And that -- you've said you're not going to use that word and we will caution people not to use that word. Agents are not to use that word. Caution your witnesses not to use that word. That expression, rather.

MS. RANDELL: Your Honor, I think that was a prior ruling from 2021 that nobody has challenged ultimately.

THE COURT: Good.

MS. RANDELL: So it's come up in the context of things like Mr. Staples' proposed testimony.

THE COURT: Yes, okay.

MS. RANDELL: But the government is fine with that ruling staying as is.

THE COURT: Okay. Anything else on motions in limine? Okay.

Then I will -- just so we don't have to have another pretrial conference in a bunch of months, I'm going to go through jury selection. And I think y'all probably all know how I do jury selection, but I'm doing it anyway.

The -- how many have we summoned?

COURTROOM DEPUTY: 50 I think you said.

THE COURT: Okay, 50. And for such a lengthy trial, my suggestion is we need to have four alternates. Everybody agree?

MS. SULLIVAN: Uh-huh (affirmative).

THE COURT: Okay. And so we will seat them in those seats and -- well, we'll seat them -- they'll come in and they'll all sit over here. And then Katheryn will call their names and we will fill the jury box and then we'll put them on this side.

She will give you -- you are very lucky that you are in my court because Katheryn prepares the seating chart with the names written in because we get them that morning as the computer has spit them out randomly. So she will give you a seating chart that

has the names and the juror number on it.

I will do a certain amount of voir dire. I will allow you to do voir dire. I usually don't limit it. I don't give you a time limit. If you start asking 50 people what bumper stickers are on their cars, I will stop you in the interest of time.

I usually get my jury before noon, even in a case like this. I move things along. I do not invite jurors to approach the bench. If there is something sensitive -- because once you do that, everybody wants to approach the bench. What I have found is that it is incredible what people will just share with an entire room full of people. And if somebody is very concerned, they will ask on their own, can I approach the bench. So I don't invite it, but I allow it if somebody wants to. And in this case there will be subject matter that may be in that category.

Then after we're finished with all the questions, I will call you to the bench and hear your challenges for cause, if there are any, and I will rule on them at the bench. But I will not excuse the challenges for cause at that time because I don't want to highlight, you know, you're particularly objectionable and you have to go right now. I excuse

them at the same time I excuse the peremptories.  So I will rule on those at the bench.

Then you will go back and you will fill out your peremptory sheets.  And then I will excuse the peremptories and the challenges for cause and then we will move everybody up numerically.  And so the first 12 will be our jurors and the next four will be our alternates.  Everybody else goes home.

MS. THOMPSON:  We pick the alternates at the same time we pick the jurors -- I mean, there's not extra strikes for the alternates, are there?

THE COURT:  You know, there are.  It's a separate process for the alternates, yes.  And I think if we're picking four, I think you get two peremptories.  Whatever the statute says.  I believe you get two peremptories for the alternates.  Yes.  In a criminal case it is a separate process, I forgot, yeah.

So we will go through the process again for the alternates, but you cannot back strike.  You cannot back strike.  You will only be able to -- we've got our jury.  You'll only be able to strike from those that are left that are not among the first 12.  It usually makes no sense whatsoever to ever strike No. 50 because No. 50 will never get in the first 16

people, no matter how many people we excuse.  You have a question mark.

MR. HAYES:  One question, Your Honor. And I'm remembering this from the trial we did almost exactly a year ago, but when we're doing the peremptories, do we alternate government first and then the defense?

THE COURT:  No.  You do them at the same time, so there's a possibility of duplicate strikes. And that helps us not run out of jurors.

I will want your witness lists for purposes of voir dire before the trial.

I don't know that this is the kind of case where you would have juror notebooks, where that makes any sense in a case like this.  Probably not. It would probably be volumes of material.  I don't really know, but I always invite people to think about a joint juror notebook that would be moved in at the beginning of the trial and then we don't have to have -- or stipulations to admit at the beginning of the trial as many exhibits as we possibly can just to shorten the process.

I allow jurors to take notes.  I caution them about note taking, but we furnish them notebooks and pens and they are allowed to take notes.

If you are going to use any demonstrative evidence in your opening, please show it to the other side ahead of time. And alert Katheryn if there are any objections so that we can arrange to rule on that in advance. Does the government anticipate any demonstratives, charts, anything like that, in your opening?

MR. HAYES: Probably. I don't think they'll be objectionable, but we'll follow the Court's procedures.

THE COURT: Share it and let me know if there's any problem.

And I think you've all used the technology in here, but if you need any further education about it, Katheryn is available.

We will basically go from 9:00 to 5:00 with one break in the morning and one in the afternoon; try very hard to adhere to that schedule. An hour for lunch. Maybe with so many jurors we'll take an hour and 15 minutes for lunch, perhaps.

The first week -- since we don't need to deal with that Friday that you're not available, the first week we probably will go four days, and then the next weeks we might go Monday through Thursday to give everybody Friday to regroup.

MR. HAYES: So you mean the first week we start on a Tuesday, Your Honor?

THE COURT: Yeah, we start on a Tuesday. So first week it would be Tuesday through Friday. And then after that we may do Monday through Thursday so that you have Friday to...

I'm hoping you-all can agree on instructions. I don't need the standard patterns, but I need the substantive instructions on the counts and any other ones that you particularly want to agree on that you don't think, you know -- like, I don't need credibility of witnesses and that sort of thing, but the core instructions. And I would like to have those the Friday before trial and a proposed verdict form.

So hopefully an agreed set of jury instructions and an agreed verdict form. If you can't agree on everything and you may have some theory of defense instruction that they don't agree with, give me your separate versions of anything you can't agree on.

MS. RANDELL: Your Honor, I think we do anticipate, and I addressed this to counsel, whether there's going to be a request for a good faith instruction even after the various cases saying that that's not appropriate.

MS. SULLIVAN: I don't ask for that anymore. I don't -- I try not to ask for that, ever.

THE COURT: Okay.

MS. RANDELL: That's one we don't have to worry about. Thank you.

MS. SULLIVAN: Unless there's a health care fraud count attached to it, but that's not the case in our case.

THE COURT: Okay.

And then I'm going to ask you to just agree once we reset the trial, agree on whatever additional expert disclosures, the direct examination and stuff has to be made.

MS. SULLIVAN: I do have a question about that. Does the jury receive the written expert testimony?

THE COURT: No.

MS. SULLIVAN: So they just read it, but it's not --

THE COURT: No, we don't receive it as an exhibit.

MS. SULLIVAN: I thought that was the answer. I wanted to be sure.

THE COURT: In this case you-all want to have the Higgins rule. You want to have the direct

reduced to writing; right? I can't remember. I may be confusing it with another one.

MS. SULLIVAN: Yes.

THE COURT: You-all want that. So the direct examination is reduced to writing, and either the witness reads it or you read it and the witness adopts. So did we do that in the last one?

MR. HAYES: We did that in the last one. In this one we agreed -- it was prior counsel agreed not to do it, and then defense made a motion they want to do it. So we agreed.

MS. SULLIVAN: Just seems like it would make these trials run a little bit smoother on the medical side of it.

THE COURT: Yes, absolutely. There's no doubt. In almost every case it makes everything run smoother because there are no surprises.

MS. SULLIVAN: In that regard too, I don't know how you feel about this, but I can't imagine you might object. On the paper medical -- not the paper, but the EMR, the printed medical records, doing a joint medical record exhibit so we don't have the experts flipping between medical records. I mean, that would require, like, us looking through all the pages to make sure, but I can't imagine you would

object to your own record being a joint if I look at it.

MR. HAYES: We don't -- what we've usually done in these cases is just all the medical records that the experts are going over are government exhibits, and everyone just uses those. But we can have it be a joint if the defendant wants it.

THE COURT: Whatever you want to do is fine.

MS. SULLIVAN: Okay.

THE COURT: And Katheryn needs paper exhibits, but you don't have to give us four copies. If you've got everything on the computer and it can be pulled up for the witness and for me and on that screen and the jurors have screens -- and so if you want to just have one paper copy for Katheryn and do everything else on the screens, that's fine.

MS. RANDELL: Your Honor, there's one potential category of exhibits that we don't think really can become paper exhibits, and that's the CSMD prescription records. The way those come out of the CSMD database, they're Excel spreadsheets with a lot of columns. Even printing on legal-size paper, it would be unreadable.

THE COURT: Okay. We'll let you have

those just on a stick or -- what do you call it, thumb drive.

MR. HAYES: Thumb drive.

MS. RANDELL: Thank you, Your Honor.

MR. HAYES: Thank you, Your Honor.

THE COURT: You don't object to that, do you?

MS. SULLIVAN: No. I mean -- no.

THE COURT: Okay.

MS. THOMPSON: One of the things is some of the medical records are electronic only, and Meggan and I were discussing with how are you going to mark some of those records for the record if you have a witness point something out.

MS. SULLIVAN: So there may be through -- our medical expert has reviewed the EMR Live. We've had a read-only access to it from the company itself, and there may be some things that are contained in the Live that don't print out when you upload it and print it. So we'll have at some point -- and we're still working through with the company how to -- evidentiarywise how to get over a couple humps with that and what's the best way to do it, but we may have a Live reading or review of the EMR itself and then screenshots of what's happening. We really -- I can't

even really explain to the Court other than exactly how we're going to try and get some of that information in. But there is discrepancies between the Live EMR and what the government's experts have reviewed because it just doesn't -- just doesn't print when you're viewing it from a Live.

THE COURT: So are you saying that you're going to have some proof that can't be on paper?

MS. SULLIVAN: Exactly.

THE COURT: Well, just work with them and make sure they know what you're talking about.

MR. HAYES: It sounds like we might have -- because what they originally proposed was a joint medical record exhibit. I guess the joint exhibit will have to include this Live EMR and maybe that's on a stick as well. I don't know if it's acceptable. If it can't be printed to paper, maybe it can't be -- it's not acceptable to being produced on a stick.

MS. SULLIVAN: I'm not trying to be rude. I don't know that it's worth talking about it yet because we don't know -- we're still working with the company exactly how we present it.

MS. RANDELL: I think we'd be happy to discuss. From our perspective a static exhibit would

47

be better also for the record going forward.  To the extent that we can do things with screenshots that show, for example, information that may not print out, that could still result in a static printable exhibit that doesn't -- that can go back, that doesn't change over time.

MS. SULLIVAN:  That may not even be possible.  That was what I thought from my lawyer brain, and the company has indicated that it may not even be possible to do that.  So -- like I said, we're still working through with the company how to get the information to a jury.

THE COURT:  Okay.  Well, that's my agenda.  So do you have any other things you wish to discuss?

MR. HAYES:  I guess, Your Honor, we're going to -- we're punting.  So that all we know for sure now is the trial is not kicking off on October 21.

THE COURT:  Correct.

MR. HAYES:  Of course, no one knows when the shutdown's going to end.

THE COURT:  Yeah.  Now, if the shutdown ended Friday, you're saying you would not want to go forward?

MS. SULLIVAN:  No, because I think -- it just depends on what that continuing resolution is.

MS. THOMPSON:  Our investigator stopped, the paralegal has stopped, so we would miss several weeks of -- I guess we're on day 8.  So we would miss eight days of them doing investigation or talking to witnesses, discovery.

THE COURT:  They're still doing investigation?  Now?

MS. THOMPSON:  Yes.

THE COURT:  Important investigation?

Seems to me if we can do it on the 21st, if we at all can do it on the 21st, let's do it on the 21st.

MS. SULLIVAN:  I would say that even if -- it really just depends.  It's hard to say because it depends how the government starts working again.

THE COURT:  Yeah.

MS. SULLIVAN:  If they start working on a two-day continuing -- I can't imagine they would do that, then that's not going to get us very far because the backlog is -- so I spoke with Kim Hodde right before the hearing because she has the most information from being the national panel rep.

THE COURT: Yes.

MS. SULLIVAN: There's currently 20,000 backlog vouchers. The continuing resolution, depending on how long it is, if they do a two-week continuing resolution, we won't have enough money to pay the backlog. So the real concern is the backlog. If experts and investigators aren't paid for what they've already done and put some money in the coffers to front the trial expenses -- so let's just forget whether -- what work has been done in the last eight days, if there's not some money in the coffers to front the trial expenses, to pull all the criminal records -- I think my investigator said it's $45 every time he pulls one.

THE COURT: Now, even when we're funded, you don't get to front -- I mean, the government doesn't pay you all in such a way that you can front money to investigators.

MS. SULLIVAN: No. Like, the investigators will pay the criminal records to pull them.

THE COURT: Yeah.

MS. SULLIVAN: They will expense it on their voucher. Like I'll pay for the binders and I'll expense it or pay for the parking and expense it.

Normally on a budgeted case when you're paid -- you know, I don't know how other panel lawyers do, I can only speak for myself. But I regularly, every 30 days -- I think that came from Judge Crenshaw at one point during COVID, if you're going to budget it, you need to file a voucher every 30 days so you're always operating 30 days ahead budgetwise.

MS. THOMPSON: Behind.

MS. SULLIVAN: With your operating expenses, as a business, it's like, okay, I've just gotten paid for 30 days, so of course I can afford to front the parking. We've got paralegals who aren't even operating on the hourly rate that the CJA lawyers are, so to ask the paralegal who may or may not get paid depending on how long the continuing resolution is, hey, I need you to front a thousand dollars for the month just to come and park and sit by me in court, it's just a lot to ask, it really is.

With our investigators, same thing. Like, they -- they -- essentially said we cannot work any more. We've got to go work on state court cases because we're getting paid right away and we're -- like, they're not keeping the lights on. That's what they -- the words that they used.

THE COURT: Well, but you seem to be

telling me that there's important stuff that paralegals and investigators would otherwise be doing right now?

MS. SULLIVAN: They would be doing important work, but the most important thing I think I'm saying is they have not been paid for four months. So until they have assurances that moving into a trial on October 21 that they've been back paid and there's some assurances that for the next month they will be paid -- and I don't know that we're going to have a continuing resolution before now that gives them those assurances.

THE COURT: Well, I think we just don't know.

MS. SULLIVAN: Because we know -- we don't know. And for that month that we're sitting in trial or let's say we only go three weeks, the three weeks -- I mean, we do know that you don't get paid during that three weeks and then you've got to submit a voucher and then you've got to wait. So we know that the actual work in trial they're not going to get paid for sitting in the courtroom and nobody can be working on anything else.

I mean, the last three months I think the people who have survived have been able to do so

because they've added to their caseload. Like, I -- I normally -- I can only handle about 15 to 20 cases a year, CJA caseload. I try not to ever get over 15 unless it's supervised release cases or something.

But because those 15 haven't been paid for four months, Jodie Bell said, well, come take some of these new initiatives that the Metro government is supplementing, the Tennessee AOC budget. So now the Idea Project is paying more than panel work per hour to go to State court. So it's taken, like, eight of our best panel members to State court to work on Idea Project. So everyone's added to their caseload to keep the cash flow.

So that is a little bit more added stress too because it's, okay, you have federal lawyers who were only taking federal work, 15, 20 cases a year, are now taking five, six, seven only A and B felonies in State court, which are attempted murder, the rape cases, some of the hardest cases. So it's adding to the caseload just to keep the cash flowing.

But when you're in court in a trial, you can't do any other work. So you're -- you know, if you're not back paid with a continuing resolution and then you have to sit in court for four weeks and you can't bill anything else, you're looking at another 30

days of zero cash flow, which is not easy.

MS. THOMPSON: Kim Hodde suggested we use the phrase constitutional crisis.

MR. HAYES: That's what I was going to say, Your Honor, because we've talked to Ms. Hodde as well. And our understanding is there's --

THE COURT: I think we need another waiver.

MR. HAYES: There's problems that they might face. There's just basic, what they're talking about the constitutional crisis, they also might face a 2255 if they don't ask for a continuance. Let's just say the shutdown ended on Friday as Your Honor said. That would be -- I think today is the 8th. That would be the 10th. What I would say, out of fairness, is they have had to go pencils down since September 30. So they've lost ten days.

So what would be fair in that since, okay, we're not going to start the trial before October 31 because they've just been in a holding pattern and their people are almost -- not refusing, I'm not going to go that far, but they really couldn't do anything. And they can't ask them to do anything. So I think that would put -- Ms. Sullivan's been very transparent about this and she informed us before the

shutdown that this might come up, so she's let us know. I do think -- I don't think the shutdown's going to end on Friday, first of all.

THE COURT: Yeah.

MR. HAYES: Even if it did, I think that we would still be counting for at least ten days they haven't be able to do important work, they haven't been able to do regular trial prep, not the same way they would have.

THE COURT: Yeah.

MS. SULLIVAN: I will say I'm really proud of our panel because I, you know, have some work in a number of other jurisdictions, in other states even, and I think our panel has really pulled themselves up by the boot straps and kept going because I know there's a lot of CJA lawyers who have just quit or did motions to stay or withdrawn from cases. And I haven't really seen that in our district. I think I'm actually the only one that's filed to continue a trial.

THE COURT: Yeah, everybody just is coming to court, doing sentencings and pleas and everything for -- ever since you haven't been paid. It's just crazy. It's totally crazy.

All right. You've convinced me. We will

not go on October 21. Motion to continue is granted. Okay.

Now, I don't know what plea discussions have taken place. I can't be a party to plea discussions, but I've made some very important rulings today. I've made some in writing and I've made a bunch more today. And I would certainly encourage you-all to revisit whether it makes sense to have a three, four-week trial of these charges with these rulings, with the evidence that's coming in, with the codefendant testifying.

I don't know what kind of offer would have been made, but Mr. Mehta certainly got -- Dr. Mehta certainly got a sweetheart deal, in the Court's opinion. And so.

MR. HAYES: All I'll say, Your Honor, we agree. And without -- you can't get involved. We have made an offer. And so -- and we'll continue these discussions. But there has been an offer made that was rejected but now maybe that will be revisited.

THE COURT: Anything else?

MS. SULLIVAN: No, Your Honor.

THE COURT: Very good. Thank you, folks.

MS. SULLIVAN: Thank you.

                    (Whereupon, at 3:00 p.m. these were all
of the proceedings had in the above-captioned cause on
the above-captioned date.)

**REPORTER'S CERTIFICATE PAGE**

I, Roxann Harkins, Official Court Reporter for the United States District Court for the Middle District of Tennessee, in Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on October 8, 2025, in the matter of UNITED STATES OF AMERICA v. HEATHER L. MARKS, Case No. 2:19-cr-03-1; that said proceedings were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate transcript of said proceedings.

This is the 22nd day of October, 2025

s/ Roxann Harkins_____
ROXANN HARKINS, RPR, CRR
Official Court Reporter